Mountaire Processing Co. *v.* Colvin.

5-3632                                    396 S. W. 2d 938

Opinion delivered November 29, 1965.

[Rehearing denied January 10, 1966.]

*Wright, Lindsey, Jennings, Lester & Shults,* for appellant.

*Shaw & Shaw, John B. Hainen,* for appellee.

Carleton Harris, Chief Justice. This is a Workmen's Compensation case. Mrs. Anna Marie Colvin was employed by Mountaire Processing Company as a trimmer. Her work was performed in a large room where there were evisceration lines. This worker stood on a platform, about two feet long and two feet wide, facing a trough about three feet wide and six to ten inches deep. Overhead was a moving mechanical line with chickens hung on it. To the right of the worker was a wash basin. Mrs. Colvin's job was trimming bruises from the chickens as they passed by on the line. On February 26, 1963, appellant fainted, while engaged in the work mentioned above, and, while falling, was caught by Ed Slough, an employee of the United States Department of Agriculture, assigned to Mountaire Processing Company, Mr. Slough working alongside of Mrs. Colvin. Other employees assisted in removing her from the work line. Dr. Roger Dickinson was called, gave her an injection

of thorazine, and Mrs. Colvin was taken home by her husband. She continued to work thereafter until March 5, at which time she went to the Dickinson Clinic, complaining of pain in the lumbosacral region of her back. She was subsequently referred to Dr. Paul Hughes, orthopedist at the Southern Clinic of Texarkana, who, in April, 1963, performed a partial laminectomy on the right side at the L4-L5 interspaces, and a large extruded mass of fibrous tissue was removed from the spinal canal. She was discharged five days later to return home, and Dr. Hughes continued to see her from time to time until September, 1963.

Mrs. Colvin signed a "statement of claim" form for benefits from the General American Life Insurance Company, the claim form denoting that her claim was due to sickness which began approximately March 5; as a result of this claim, benefits were paid to her for thirteen weeks. Thereafter, Mrs. Colvin filed a claim for Workmen's Compensation benefits, asserting that the herniated disc was the result of her fall at the plant on February 26. The referee allowed her claim, but this finding was reversed by the full commission, which found that the extruded disc was not the result of an accidental injury arising out of and in the course of her employment with Mountaire on February 26, 1963. The commission finding was appealed to the Sevier County Circuit Court, and that court reversed the commission, holding that there was no substantial evidence to support the findings of fact made by the commission, and the court further found that the injury to claimant arose out of, and in the course of, her employment, and that she was entitled to Workmen's Compensation benefits. From the judgement so entered, Mountaire and its insurance carrier, Fidelity and Casualty Company bring this appeal.

We are only concerned here with whether there was substantial evidence to support the finding of the commission. Claimant testified that while she was working, she felt a "dizzy spell coming on;" that she had previously had the flu, and that she thought, "Well, I'm

going to faint." She said that she was standing on a narrow platform, slipped, and "that throwed me kind of backwards and I hit this wash basin and tried to catch forwards to keep from falling back on the concrete floor." The witness stated that she lost her balance, and fell back, the lower region of her back striking the wash basin. This is the evidence relied upon to establish the compensable injury, but claimant's version is not corroborated by any other witness, including those offered by Mrs. Colvin. Mr. Slough testified, "Well, I just glanced to one side and I noticed that she was just dropping down, just suddenly wilting and I reached over and grabbed her and moved her back away from the trough." He stated that she just fell "straight down," and that he did not see her strike the wash basin. Mr. Henry W. Shook, another government inspector, who was working opposite Mrs. Colvin on the line, likewise testified:

"Well, she sort of wilted right in front of me just over on the trough down beside of that washbasin that was out beside the trough. She just sort of wilted right down the side and over the trough."

Frank Halter, the plant foreman, testified that he looked at claimant while she was being held up by Mr. Slough, and that her feet were still on the platform at the time.

Mrs. Colvin testified that Dr. Roger Dickinson came out to the plant, and gave her a shot, and later gave her some pills; that she went back to work the following day, and worked the balance of the week. Claimant said that she first noticed pain in her back the next day, as she started to take off her boots, and that from that time on, the pain gradually grew worse; that she then consulted Dr. Bill Dickinson. She testified that the doctor asked if she had had any fall, and that she told him about falling on the 26th, and also told him that Dr. Roger Dickinson knew about it.[1] She also testified that, upon being sent to Dr. Hughes in April, she told this doctor

---

[1] Mrs. Colvin worked about a week after consulting Dr. Bill Dickinson at the clinic.

about the fall, and slipping and striking her back on the basin.

Dr. Bill Dickinson testified that his records did not show, and he had no recollection of Mrs. Colvin's telling him that she received an injury at the plant. He testified that ordinarily, when receiving a complaint like that of Mrs. Colvin, he would have made inquiry (whether she had received an injury). He also stated that normally, if an injury had been reported, he would have notified the plant, but that he had not given the plant any notice in this case.

Dr. Roger Dickinson, brother of Bill, testified that he went down to the plant after receiving a call, around 8:00 or 8:30 in the evening (February 26), and that he gave Mrs. Colvin a shot of thorazine ("to try to settle her down so that she could go home and go to sleep"). He stated that he inquired as to what had happened, and was told that she had gotten sick and fainted. The doctor stated that he did not remember Mrs. Colvin's ever having given a history of being injured, or of having injured her back while at the plant.

Dr. Hughes did not testify, but a disability insurance form, which had been signed by him and Mrs. Colvin was introduced into evidence by the claimant.[2] Near the top of the form is a clause as follows:

"Claim is) ☒ Sickness which commenced on '[typed in] approx Mar. 5, 63'

Due to) ☐ Accident which occurred on ........................................
At..........................................

It will be observed that an "x" is placed in the square by "Sickness."

On Page 2 there is a question, "Did this sickness or injury arise out of the patient's employment?" There are then two spaces for the answer, one marked, "Yes," and one marked, "No," and the "No" is checked.

---

[2] This claim was referred to earlier in the opinion; Mrs. Colvin drew benefits from this group insurance plan for thirteen weeks in the amount of approximately $25.00 per week.

To summarize, claimant testified that she fell against the wash basin, her back striking it. This is not verified by any witness; in fact, both Edwin Slough and Henry Shook, whose testimony was offered by appellee, stated that she "wilted" and "dropped down," and neither saw her strike the wash basin. The Dickinson brothers, though stating that inquiry was normally made as to possible injuries, when examining and interviewing patients with a back ailment such as that complained of by Mrs. Colvin, had no recollection of claimant's relating any injury, and their medical records did not reflect any such information. The claim form, filled in by Dr. Hughes, and signed by Mrs. Colvin, affirmatively shows that her insurance claim was designated as being due to sickness, rather than an accident, and further reflects that the ailment did not arise out of her employment. No doctor testified that her condition was due to her fall or to an injury.

Of course, it is immaterial what this court would find if we were trying the case *de novo,* for the commission is the trier of the facts, and we review the findings of that body in the light most favorable to its findings if same are supported by substantial evidence. *Burrow Construction Co.* v. *Langley,* 238 Ark. 992, 386. S. W. 2d 484. In the light of what has been set out in this opinion, we are unable to agree with the learned Circuit Judge that there was no substantial evidence to support the findings of the Compensation Commission.

The judgement of the Sevier County Circuit Court is therefore reversed, and that court is directed to reinstate the order of the Workmen's Compensation Commission denying compensation.

It is so ordered.

ROBINSON, JOHNSON and HOLT, J. J., dissent.

JIM JOHNSON, Associate Justice. (dissenting). I do not agree with the majority view. The referee who conducted the hearing in this case concluded from the evidence presented that:

"It is not disputed that claimant received an operation for a herniated disc. The difficult question therefore is whether this herniated disc arose out of claimant's employment with respondent. The referee is of the opinion that the evidence reflects that such is the case. Claimant testified that she fainted while trimming poulry in respondent's plant on February 26, and that before she passed out she remembered falling backward and striking her back against the wash basin which was located to her right and slightly to the rear of her work area [about six inches from her]. She further stated that she attempted to pitch forward to prevent herself from falling striking the floor, and that the following evening when removing her work boots, she noticed pain in the lumbo-sacral area [where her back struck the basin]. The evidence reflects that this pain became progressively worse during the next eight or ten days, culminating in the necessity of claimant being placed in traction for a period of eight days. It was not disputed that claimant did faint while working on respondent's poultry line. Mr. Ed Slough testified that when he first noticed claimant she was falling toward the trough, and that he caught her before she struck the floor. While none of the witnesses testified that they had observed claimant striking the wash basin, [none denied it happened], all of them did testify that they did not observe claimant until the line was stopped, at which time she was being held up by Mr. Slough. Thus we have claimant's testimony that she had never been bothered with her back prior to the fainting episode; that she struck her back as she fell; that the following night she noticed soreness and pain in her lumbo-sacral region; that this pain became progressively worse; and approximately ten days subsequent to her fainting episode, she had to be carried to the hospital and placed in traction.

"While the record does not reflect that claimant definitely gave the Drs. Dickinson a history of having injured her back on the job, the record does reflect that claimant testified that she naturally assumed that the doctors would relate her back injury to her fall, and the

record does reflect that the doctors both at a later date connected claimant's trouble up with her fall and fainting episode there at the plant. Dr. Roger Dickinson's notes reflect that 'Dr. Roger was called to the plant the night this lady fell, gave her an injection, and let her go home.' Dr. Roger Dickinson testified that this was in Dr. Bill Dickinson's handwriting. This would tend to reflect that the doctors eventually connected the fainting episode with claimant's herniated disc.''

Without the benefit of additional evidence, the full commission almost summarily reversed the award.

On appeal to the circuit court this matter received a through review. The circuit court, obviously aware of the limited scope of its authority in workmen's compensation cases, rendered a most conscientious and comprehensive opinion both as to the law and the facts. The court said, *inter alia*:.............

''The record of the hearing before the Referee shows that the claimant is thirty-six years old and had been employed by the respondent processing company for approvimately three years. That on the night of February 26, 1963, while trimming poultry on the evisceration line in respondent's plant, and after having worked for six and one-half hours that day, she became dizzy, which produced a sensation of faintness, and in her words: 'Well, I had become dizzy and I thought ''Well, I'm going to faint,'' I just felt so bad and I turned to look to see if I could get someone to take my place. You see, when I would leave the line, it would be stopped and I slipped on this thing I was standing on and that threw me back against this wash basin and then I, you know, tried to catch forward and that's the last I knew.' She further testified that she definitely and positively remembered striking that wash basin.

''The undisputed testimony before the Commission shows that she was carried from the processing room of the plant to the plant lunch room; that she was treated in the plant lunch room by Dr. Roger Dickinson, administered a sedative, and sent home.

"The claimant continued to work the remainder of the week, which was three days; that she worked the next week; that the pain and sorness became progressively worse; that on the 5th day of March, 1963, she went to the Dickinson Clinic and Dr. Bill Dickinson prescribed sedatives by reason of the pain and soreness in her back; that Dr. Bill Dickinson, on March 11, 1963, placed her in the DeQueen Clinic where she was confined in traction for a period of eight days; that she did not improve and was subsequently referred by Dr. Dickinson to Dr. Robert Hughes in Texarkana. Dr. Hughes first saw claimant on April 2, 1963, and a diagnosis of herniated nucleus pulposis was made; the claimant was admitted to St. Michael's Hospital in Texarkana on April 9, 1963, at which time a myelogram was done, which showed almost complete occlusion of the spinal canal in the level of the L4-L5 interspace; that on April 10, 1963, a partial laminectomy on the right side was done at the L4-L5 interspace, and a large extrudal mass of fibrous tissue was removed from the spinal canal.

"To substantiate the testimony of the claimant, the Commission heard the testimony of her husband, Joe Colvin, who testified that following her alleged injury and all the next week, his wife complained a little more every day about her back, and it finally reached the point where she couldn't even lift her right leg."

The court set out additional testimony substantiating appellee's claim and concluded that:

"There is no evidence and no opinion to the effect that claimant's injury was not or could not be caused by the fall she unquestionably sustained. None of the three doctors who treated her, including the one who operated on her, was ever asked if the injury could have been caused by the fall she sustained on the job, and none expressed an opinion about the matter one way or the other.

"The record of the hearing before the Commission affirmatively shows that the claimant sustained no

known injury or any other incident prior to or after February 26, 1963, which contributed in any way to her disability. The question before the Court, therefore, is whether the action of the Commission in denying compensation for claimant's disability is supported in the record by substantial evidence."

"After having examined the entire record in this case day after day, this Court can find no substantial evidence to support the findings of fact of the Commission. On the contrary, this Court finds from the record in this case that said findings of fact are speculative and conjectural." *Clark* v. *Ottenheimer Brothers,* 229 Ark. 383, 314 S. W. 2d 497.

From all of which this case in my view falls squarely within the rule announced in *Hall* v. *Pittman Constr. Co.,* 235 Ark. 104, 357 S. W. 2d 263, as follows:

"If the claimant's disability arises soon after the accident and is logically attributable to it, with nothing to suggest any other explanation for the employee's condition, we may say without hesitation that there is no substantial evidence to sustain the commission's refusal to make an award."

For the reasons stated, I respectfully dissent. Justices ROBINSON and HOLT join in this dissent.